**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**REHABILITATION SUPPORT SERVICES, INC.,**

                                    **Plaintiff,**

            **v.**                                    **1:15-CV-589**
                                                      **(FJS/DJS)**

**TOWN OF COLONIE,**

                                    **Defendant.**
_____

**APPEARANCES**                          **OF COUNSEL**

**MORITT HOCK & HAMROFF LLP**            **ROBERT L. SCHONFELD, ESQ.**
400 Garden City Plaza, Suite 202
Garden City, New York 11530
Attorneys for Plaintiff

**FRIEDMAN, HIRSCHEN AND**               **CAROLYN B. GEORGE, ESQ.**
**MILLER, LLP**
100 Great Oaks Boulevard, Suite 124
Albany, New York 12203
Attorneys for Defendant

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court are Defendant's motion for summary judgment, _see_ Dkt. No. 21,

and Plaintiff's motion for summary judgment, _see_ Dkt. No. 22.

### II. BACKGROUND

"Plaintiff . . . is a not-for-profit corporation that provides housing for people with mental

disabilities throughout New York State . . . and residential services for people with mental

disabilities in 13 counties to 1,423 people throughout New York State." *See* Dkt. No. 22-4 ("Plaintiff's Statement of Facts") at ¶ 1 (citing DeVita Affidavit, par. 3); ¶ 2 (citing DeVita Affidavit, par. 4).  Defendant ("Defendant Town") is "a suburban community near the City of Albany[, New York]." *See* Dkt. No. 1 ("Complaint") at ¶ 5.  Plaintiff seeks "to establish housing for people with mental disabilities at a site located at 179 Troy-Schenectady Road in . . . Defendant Town . . . ." *See id.* at ¶ 1 ("the site").

Plaintiff commenced this action on May 13, 2015, following Defendant Town's enactment of Town of Colonie Local Law No. 2 of the year 2015 ("Local Law 2-2015"), which rescinded the site's classification as a "planned development district " ("PDD").  *See* Plaintiff's Statement of Facts at ¶ 49 (citing Exhibit P, Transcript of Town Board meeting, 43:1-44:5; Local Law 2-2015 (Exhibit S)); Dkt. No 22-23 (" Local Law 2-2015") at 2 ("rescinding Local Law 11 of 2007, [which had] "change[d] the Zoning Classification of 179 Troy-Schenectady Road from a Commercial Office Residential (COR) to a Planned Development District (PDD) Classification" and "returning the zoning districts and zoning map to their former status").[1]  Plaintiff contends that, by enacting Local Law 2-2015, Defendant Town "ma[de] it impossible for [Plaintiff] to develop its proposed housing for people with disabilities or go forward with its tax credit application[.]"  *See* Complaint at ¶ 34. Plaintiff also avers that Defendant Town "rush[ed] through" the PDD rescission procedure "to destroy [Plaintiff's] attempts to obtain tax credits from New York State."  *See* Complaint at ¶ 44; *see also* Plaintiff's Statement of Facts at ¶ 50 (stating that, as a result of the enactment of Local Law 2-

---

[1] Generally, the Court's references to page numbers are to those page numbers that the Court's electronic filing system ("CM/ECF") generates.  However, citations to transcripts of any kind are to the actual page numbers of those transcripts designated in the following manner: [page number]:[line numbers].

2015, Plaintiff's "tax credit application was denied since it was unable to show municipal support for its proposed housing" (citing DeVita Affidavit, par. 20)). Plaintiff alleges that, "[b]ased upon the sequence of events and the fact that [Defendant Town] applied different substantive and procedural criteria to [Plaintiff's] PDD project than to other similarly situated PDD projects, [Defendant Town] engaged in intentional discrimination on the basis of disability in violation of the Federal Fair Housing Act" and "the Americans With Disabilities Act." *See* Complaint at ¶¶ 50, 53.

Plaintiff filed a motion for summary judgment with regard to both of its discrimination claims and requested, among other things, that the Court annul Defendant Town's Local Law 2-2015, which "rescinded its previous local law of July 12, 2007 creating the PDD zoning classification allowing residential housing at [the site]," and "direct[] [Defendant Town] to approve any necessary amendments to the previous local law of July 12, 2007 and not interfere with [Plaintiff] seeking tax credits from the State." *See* Complaint at WHEREFORE Clause.

Defendant Town also filed a motion for summary judgment on the ground that Plaintiff's claims were not ripe for adjudication and that, therefore, the Court lacked subject matter jurisdiction over this matter. *See* Dkt. No. 21-32 ("Defendant's Memorandum") at 6. Alternatively, Defendant Town argued that Plaintiff's claims were without merit as a matter of law. *See id.*

## III. DISCUSSION

### A.    Subject matter jurisdiction

"Ripeness is a jurisdictional inquiry"; and, as such, the court "must presume that [it] cannot entertain the [plaintiff's] claims 'unless the contrary appears affirmatively from the record.'" *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (quoting *Renne v.*

-3-

*Geary*, 501 U.S. 312, 316, 111 S. Ct. 2331, 115 L. Ed. 2d 288 (1991)) (other citation omitted).  A plaintiff bringing a zoning challenge "must meet 'the "high burden" of proving that [the court] can look to a final, definitive position from a local authority to assess precisely how [the landowner] can use [its] property' before [the] Court may entertain [its] claims." *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 121 (2d Cir. 2014) (quoting *Murphy*, 402 F.3d at 347).

To determine whether a case is ripe, the court must "'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Murphy*, 402 F.3d at 347 (quoting *Abbott Labs.*, 387 U.S. at 149, 87 S. Ct. 1507).  The "'fitness of the issues for judicial decision' prong recognizes the restraints Article III places on federal courts."  *Id.* (citation omitted).  As such, "[i]t requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development."  *Id.* (citation omitted).  "The 'hardship to the parties' prong clearly injects prudential considerations into the mix, requiring [a court] to gauge the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined."  *Id.* (citing *Abbott Labs.*, 387 U.S. at 149, 87 S. Ct. 1507).

In the context of land use disputes, the "fitness of the issues" prong requires that the court ask whether "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."  *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985).  The Second Circuit has extended this "final decision" requirement to discrimination claims under the FHA and ADA.  *See Sunrise Detox V, LLC*, 769 F.3d at 123 (holding that "a plaintiff alleging discrimination in the context of a land-use dispute is subject to the final-decision requirement unless he can show that he suffered some injury independent of the challenged land-use decision"); *see also*

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 598 (S.D.N.Y. 2013) (stating that "[t]he final decision requirement . . . applies to land use disputes arising under New York law" (citations omitted)).  Lastly, the "final decision" requirement helps courts "distinguish between those cases in which a plaintiff has suffered a 'concrete and particularized,' 'actual or imminent' injury, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992), and those in which the injury is 'merely speculative and may never occur, depending on the final administrative resolution,' *Dougherty*, 282 F.3d at 90." *Sunrise Detox V, LLC*, 769 F.3d at 122 (other citation omitted).

To satisfy the "final decision" prong of the ripeness inquiry, a plaintiff must demonstrate that it has obtained a "final, definitive position as to the application of the relevant zoning laws to the property from the municipal entity responsible for those laws." *Congregation Rabbinical Coll.*, 915 F. Supp. 2d at 597 (citation omitted).  Therefore, generally, a plaintiff may not seek federal court review of a zoning ordinance or provision until "'a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations.'" *Id.* at 598 (quoting *S & R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008)) (citing *Ecogen*, 438 F. Supp. 2d at 155 (holding that the final decision rule generally requires "that the plaintiff . . . have submitted at least one application for, and been denied, permission for the proposed structure or use of the subject property")) (other citations omitted).

The Second Circuit, however, does not apply the finality requirement "mechanically" and will instead excuse a property owner "from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Murphy*, 402 F.3d at 349; *see also,*

*e.g., Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012 n.3 (1992) (stating that an application for a variance was not required when it would be "pointless" as the defendant had stipulated that "no building permit would have been issued . . . application or no application" (citation omitted)). *But see Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 136-37 (1978) (finding the plaintiffs' claim unripe because, although the city commission had denied "applications to construct an office building in excess of 50 stories above the Terminal m[ight] indicate that it w[ould] refuse to issue a certificate of appropriateness for any comparably sized structure, nothing the Commission ha[d] said or done suggest[ed] an intention to prohibit *any* construction above the Terminal"). "[T]o invoke the futility exception, a plaintiff must demonstrate: (1) 'that [it] has filed "at least one meaningful application,"' and (2) 'the inevitability of refusal of the [] application, taking into consideration factors such as "the defendants' hostility, delay and obstruction."'" *Congregation Rabbinical Coll.*, 915 F. Supp. 2d at 601 (quoting *Osborne*, 2009 WL 884697, at *5 (quoting *Dix v. City of New York*, No. 01-CV-6186, 2002 WL 31175251, at *6-7 (S.D.N.Y. Sept. 30, 2002))) (citing *S & R Dev. Estates*, 588 F. Supp. 2d at 463-64) (footnote omitted).

Additionally, the Second Circuit has exempted plaintiffs "alleging discrimination in the context of a land-use dispute" from meeting the final-decision requirement if they "can show that [they] suffered some injury independent of the challenged land-use decision." *Sunrise Detox V, LLC*, 769 F.3d at 123. "[F]or example, a plaintiff need not await a final decision to challenge a zoning policy that is discriminatory on its face, *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1541 (11th Cir. 1994), or the manipulation of a zoning process out of discriminatory animus to avoid a

final decision, *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199-200 (5th Cir. 2000)."[2]

*Sunrise Detox V, LLC*, 769 F.3d at 123.

In *Sunrise Detox V, LLC*, the Second Circuit found that a plaintiff's discrimination claim was not ripe for adjudication because, "[b]y forgoing the avenues for relief outlined in the commissioner's revised determination, [the plaintiff] deprived the city of the opportunity to issue a final decision." *Sunrise Detox V, LLC*, 769 F.3d at 124 (citing Ordinance § 6.4.5.2 (barring the city from taking any further action on an application until the applicant procures all required variances)). Thus, the court concluded that

> [a] federal lawsuit at this stage would inhibit the kind of give-and-take negotiation that often resolves land use problems, and would in that way impair or truncate a process that must be allowed to run its course. In light of [the plaintiff's] midstream abandonment of the zoning process, its claim is not yet ripe.

---

[2] In *Groome Res. Ltd*, the Fifth Circuit, among other things, affirmed "the district court's holding that the issue before this court [was] ripe for review." *Groome Res. Ltd, L.L.C.*, 234 F.3d at 198. In addressing the "fitness of the issues for judicial decision" prong of the ripeness test, the Fifth Circuit noted that the district court had

> recognized that ninety-five days had elapsed between the time the application was submitted and the filing of the lawsuit, and despite the target date of forty-five days, the application had been pending for 127 days without action at the time of the court's decision. During this time, Groome Resources was required to postpone its closing date several times. . . . Further, the court found that four months after the filing of the lawsuit, the Parish officials in charge of the application could not provide any timetable or plan for acting on the application. While never formally denying the request, the Parish's unjustified and indeterminate delay had the same effect of undermining the anti-discriminatory purpose of the FHAA. As no further factual development was required, the district court exercised its discretion to resolve the legal issue presented.

*Id.* at 199-200 (internal footnote omitted).

*Id.*

Moreover, the court noted that, "[e]ven if it were true that the challenged rejection by the Building Department was the product of a discriminatory motivation on the part of the official who issued it, that illegal act would not necessarily require, as a remedy, the issuance of a permit to [plaintiff]."

*Id.* at 123.  The court explained that, if the plaintiff

> proceed[ed] with its application, the rejection [might] be reversed, and the project [might] be permitted to proceed -- or the application [might] be rejected on other, non-discriminatory grounds.  Only after [plaintiff] complete[d] the process [would] it be known whether the allegedly discriminatory decision of the official had [had] any effect at all on [plaintiff's] application.

*Id.*

On the other hand, in *Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762 (E.D.N.Y. 1999), the court held that the plaintiff's claim met the finality requirement because it had submitted a fully conforming application; and, thereafter, the town board had enacted a local law "effectively den[ying] [the plaintiff's] application for a special use permit, and significantly chang[ing] the standards and procedures governing [the plaintiff's] attempt to obtain approval for its [project]."  *Id.* at 770.  The court found that "this decision [was] final because the Town ha[d] made it clear that it [would] not willingly 'grandfather' [the plaintiff's] application under the old law[.]"  *Id.* at 770-71.  Moreover, despite the fact that the plaintiff could apply to the town board for a zoning change and might ultimately receive permission to build its project, such action would not eradicate the plaintiff's injuries, *i.e.*, it had invested more than $200,000 in the project; it could have potentially lost the right to purchase the property altogether depending on the application's delay; and it would be required to modify its project plans to meet the requirements of the new local law.  *See id.* at 771.  For all these reasons, the court found that the plaintiff's claim was ripe for

adjudication.  *See id.*; *see also Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d

Cir. 2015) (holding that the plaintiff had standing to bring its discrimination claim when the city

rezoned the property in question, denied the plaintiff's special use permit thereby rendering the

development of the project "impossible," and the plaintiff had expended more than $81,000 in fees

in connection with the project's proposal).

Similarly, in *Step by Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112 (N.D.N.Y. 2016),

the court granted the plaintiff's request for a preliminary injunction requiring the town to approve

the plaintiff's PDD application to establish a mental health facility.  The court stressed the facts that

the city council had denied the plaintiff's original PDD application "without the benefit of any

reconsideration by the County Planning Board,"had enacted a new law that precluded the plaintiff's

project, and had "completely fail[ed] to describe the reasoning and logic behind the denial of [the

plaintiff's] application."  *Id.* at 121, 129, 132.

In this case, the Town Board enacted Town of Colonie Local Law No. 11 of the year 2007

("Local Law 11-2007") "to facilitate residential development at the site."  *See* Plaintiff's Statement

of Facts at ¶ 14 (citing Exhibit F, Town of Colonie Local Law 11-2007); Dkt. No. 22-10 ("P-Local

Law 11-2007") at 4 ("rezoning [the site] from a Commercial Office Residential (COR) District to a

Planned Development District (PDD)").  By enacting Local Law 11-2007, the Town Board rezoned

the site "to a [PDD] upon the condition that it shall be developed as a mixed use complex with 128

residential condominium apartment units in 16 buildings and a 6,000 sq. foot general office building

. . . ."  *See* P-Local Law 11-2007 at 4.  In addition, attached to Local Law 11-2007 was a list of

eighteen "Express Conditions," upon which the rezoning of the site was contingent.  *See* Dkt. No.

21-4 ("D-Local Law 11-2007") at 6-8.  However, the "developer [whose application for the PDD

was granted] was unable to build the condominium units because of the recession . . . [and] in 2010 advised the Town that it was no longer interested in building the condominium units." *See* Plaintiff's Statement of Facts at ¶ 16 (citing DeVita Affidavit, par. 6); *id.* at ¶ 17 (citing Exhibit G, February 26, 2010 Memorandum).

In 2014, Plaintiff "proposed an innovative supportive housing project" on the site, *see* Plaintiff's Statement of Facts at ¶ 19 (citing DeVita Affidavit, par. 7), which "would include the construction of 128 units of supportive housing for people with mental disabilities, affordable senior housing and workforce housing[,] *see id.* at ¶ 20 (citing DeVita Affidavit, par. 8). At that time, the property was still classified as a PDD, *see id.* at ¶ 18 (citing Exhibit B, Deposition of Joseph LaCivita, 30:2-3); and Defendant Town had taken no action on the PDD "even though it had the discretion to eliminate the PDD and remove the property back to its original classification," *see id.* (citation omitted), after the developer had advised the Town in 2010 that "it was no longer interested in building the condominium units," *see id.* at ¶ 17 (citing Exhibit G, February 26, 2010 Memorandum). Plaintiff's representatives  arranged to meet with Defendant Town officials to discuss the proposed project. *See id.* at ¶ 24 (citing DeVita Affidavit, par. 11).

At that meeting on October 14, 2014, at which several of Plaintiff's representatives and Joseph LaCivita, Defendant Town's Director of Planning and Economic Development, were present, *see id.* at ¶ 25 (citing DeVita Affidavit, par. 12), Plaintiff's representatives stated that the intended project would "use roughly the same footprint as the initial project," *see id.* at ¶ 21 (citing DeVita Affidavit, par. 9), and "explained . . . that there was a need for [Plaintiffs] proposed housing in the Town, that the project met the standards and objectives for a PDD, and that the project was less dense than the initial project since there would be fewer bedrooms per unit and that the

anticipated traffic would be reduced because the residents would not typically drive their own cars[,]" *see* Dkt. No. 22-2, Affidavit of William DeVita, sworn to on February 2, 2017 ("DeVita Aff."), at ¶ 13.  According to Plaintiff, following this discussion, Mr. LaCivita informed Plaintiff's representatives that Plaintiff "could file an amendment to the existing PDD law."  *See* Plaintiff's Statement of Facts at ¶ 28 (citing Exhibit B, Deposition of Joseph LaCivita, 67:6-67:12); Exhibit 22-6, Transcript of Deposition of Joseph LaCivita ("P-LaCivita Tr.") at 67:9-12 (testifying that the PDD "would need an amendment and therefore we would need a subsequent meeting with Mr. Magguilli [the Town Attorney] to go through what the process would hold").

    At a follow-up meeting on November 10, 2014, to discuss the project, the Town Attorney, Michael Maggiulli ("Town Attorney"), advised Plaintiff's representatives "that [Plaintiff] could not file an amended application for a PDD and that [Plaintiff] instead had to file a brand new application for a PDD."  *See* Plaintiff's Statement of Facts at ¶ 33 (citing Exhibit I, Deposition of Michael Magguilli, 29:22-30:6; Exhibit J, Deposition of Kenneth Kearney, 44:3-15).  During that meeting, Plaintiff contends that the Town Attorney asked Plaintiff's representatives "whether any of the proposed residents were coming from the City of Albany," to which Plaintiff's representatives responded in the affirmative.  *See* Plaintiff's Statement of Facts at ¶ 34 (citing DeVita Affidavit, par. 17).  According to Plaintiff's representatives, the Town Attorney "made an unpleasant expression upon learning some of the residents would be coming from the City of Albany."  *See id.* at ¶ 35 (citing DeVita Affidavit, par. 18; Exhibit J, Deposition of Kenneth Kearney, 58:16-22; Exhibit K, Deposition of Brian Sipperly, 41:13-16).  Plaintiff asserts that "[i]t is well understood by people in the Capital District that if residents were coming from the City of Albany, more of those residents would be people of color and people with mental illness."  *See* Plaintiff's Statement of Facts at ¶ 36

(citing DeVita Affidavit, par. 19; Exhibit H, Deposition of Paula Mahan, 29:22-30:6).

Following the November 10, 2014 meeting, Plaintiff learned from a member of Defendant Town's Planning and Economic Development Department that the Town Attorney's Office intended to seek a rescission of the PDD for the site, *i.e.*, "to return the property to its former COR classification." *See* Dkt. No. 22-17, Michael Lyons' email dated December 11, 2014 ("Lyons email"), at 2; *see also* Plaintiff's Statement of Facts at ¶ 39 (citing Exhibit M, Michael Lyons e-mail). Moreover, "[o]n December 18, 2014, the Town Board adopted a resolution put forth by Town Attorney Magguilli calling a public hearing on January 22, 2015 in connection with the proposed rescission of the PDD." *See* Plaintiff's Statement of Facts at ¶ 40 (citing Exhibit N, Transcript of Town Board meeting, 27:7-28:2).

At the public hearing on January 22, 2015, Plaintiff's "representatives presented a letter to each of the Town Board members explaining [Plaintiff's] proposed project[,]" *see* Plaintiff's Statement of Facts at ¶ 42 (citing Exhibit O, Letter to the Town Board), and "presented [Plaintiff's] position," *see id.* at ¶ 43 (citing Exhibit P, Transcript of Town Board meeting). Specifically, Mr. Fogarty, Plaintiff's Director of Facilities, stated that, at a meeting that Plaintiff's representatives had had with Mr. LaCivita, Mr. LaCivita had indicated that "he felt that [Plaintiff] could do a minor amendment to the PDD which would make [Plaintiff] completely compliant with the PDD for 2007." *See* Dkt. No. 22-20 ("P-January 22, 2015 Public Hearing Tr.") at 19:3-6. Mr. Fogarty further stated that he had understood from the October 2014 meeting with Mr. LaCivita that "all [Plaintiff] needed was a minor amendment and it would be six months to process trough [sic]. He explained it. Go to the Town Board and send it to Planning and bring it back to the Town Board, set the zoning and come back and get the building permit." *See id.* at 21:20-24.

-12-

At the conclusion of the January 22, 2015 public hearing, "[t]he Town Board voted 5-2 to follow Town Attorney Magguilli's proposal to rescind the PDD on the property." *See* Plaintiff's Statement of Facts at ¶ 49 (citing Exhibit P, Transcript of Town Board meeting, 43:1-44:5; Local Law 2-2015 (Exhibit S) which was enacted as a result of that vote); Dkt. No. 21-11 ("D-January 22, 2015 Public Hearing Tr.") at 44:6. At that time "[Plaintiff] was neither the owner of the [site], nor had it submitted any formal application to Defendant Town for its [project]." *See* Defendants' Statement of Facts at ¶ 73 (citing Rosano tr: p. 44 line 14 - p. 45 line 20, p. 58 line 13 - p. 61 line 18; Green tr: p. 33 lines 19-23; Mahan tr: p. 56 lines 16-24; p. 57 lines 14-15). However, in response to a question from a member of the Town Board prior to the vote, Plaintiff's attorney explained that Plaintiff was "under contract to purchase the [site]," *see* P-January 22, 2015 Public Hearing Tr. at 4:17-18, "contingent on obtaining the necessary approvals to develop the project," *see id.* at 6:22-24, and on getting the tax credits from New York State, *see id.* at 23:4-9.

Based on its review of the entire record in this case, the Court concludes that Plaintiff has not met the "final decision" prong of the ripeness test. Therefore, the Court must consider whether to excuse Plaintiff from this requirement based on the futility of requiring Plaintiff to engage in further administrative action.

Plaintiff has produced some evidence that would support a finding that requiring Plaintiff to obtain a final decision from Defendant Town would be futile. Although Plaintiff had no pending formal application before the Town Board at the time that the Town Board enacted Local Law 2-2015 in January 2015, Plaintiff currently has and has had such an application pending before Defendant Town for a significant period of time. In this regard, Plaintiff's counsel stated, in his May 10, 2017 affidavit, that he and Defendant Town's counsel had

> agreed that [Plaintiff] would file an application for a PDD in an
> attempt to resolve this case. . . . However, the parties agreed that this
> application would neither be denominated as an application for an
> amendment for a PDD nor an application for a new PDD so that
> neither party's arguments would be compromised.

*See* Dkt. No. 27, Affidavit of Robert L. Schonfeld, sworn to May 10, 2017 ("Schonfeld May 10, 2017 Aff."), at ¶¶ 5-6.

Furthermore, Plaintiff's counsel asserted that "[i]t [was] understood that the application [would] be heard by the Town's Planning Board on **May 23, 2017**." *See id.* at ¶ 7 (emphasis added). Since the parties had not advised the Court of whether Defendant Town's Planning Board had taken any action regarding Plaintiff's application on May 23, 2017, the Court directed the parties to file a joint letter setting forth the current status of Plaintiff's application. *See* Text Order dated December 19, 2017. In a letter dated December 20, 2017, the parties advised the Court that, although Plaintiff "[h]ad submitted an application [with regard to a PDD] to the Town of Colonie[, which was] presently under review by the Town Planning Board," *see* Dkt. No. 30 at 1, it had not yet received a final decision from Defendant Town regarding its pending PDD application, *see id.* (noting that Plaintiff "anticipate[d] that the Planning Board and the Town [would] continue to process this application, and that the application will be processed in an appropriate manner").

Despite Plaintiff's understanding that Defendant Town's Planning Board would discuss Plaintiff's application in May 2017, by the time the parties submitted their joint letter on December 20, 2017, nearly seven months later, Defendant Town had taken no action regarding that application. Given this lengthy delay and absent any explanation as to why Defendant Town had not taken any action with regard to Plaintiff's application, the Court finds that, requiring Plaintiff to engage in "'[a]ny further efforts to work within administrative apparatus would be an exercise in futility.'" *Sunrise Dev., Inc.*, 62 F. Supp. 2d at 770 (quoting *Easter Seal of Society of New Jersey v.*

-14-

*Township of North Bergen*, 798 F. Supp. 228, 236 (D.N.J. 1992)) (other citation omitted).

Alternatively, the Court finds that, although Plaintiff might ultimately receive permission to develop its project at the site, such action would not eradicate the injury that Plaintiff has already suffered as a result of the delay that has already occurred. If the Court were to find that Defendant Town's conduct was discriminatory, Plaintiff "would be entitled to a judgment against . . . [D]efendant [Town] for the injuries suffered as a result of such conduct regardless of whether . . . [Defendant] Town ultimately permit[ted] the [project] to be built [on the site]." *Id.* at 771. Moreover, if the Court were to withhold consideration of Plaintiff's claims, "each day that passes while the project is delayed means delay for [individuals with mental disabilities whom Plaintiff serves] in obtaining the housing the [project] would afford." *Id.* "Moreover, delay could prevent the project from being built and thus cause the loss of" any investment to date. *Id.* On the other hand, "there is nothing to be gained by withholding judicial consideration of this controversy. The allegedly discriminatory conduct has already occurred and its effects are known." *Id.* Thus, the Court concludes that Plaintiff and the individuals with mental disabilities whom Plaintiff serves "will suffer hardship if the [C]ourt does not promptly adjudicate this controversy." *Id.*

Accordingly, for all these reasons, the Court concludes that Plaintiff's claims are ripe for judicial review.

**B.    Merits of Plaintiff's ADA and FHA claims**

Plaintiff alleges that,

> [i]n rescinding the zoning classification based on the sequence of events just prior to the rescission and in applying different substantive criteria and procedures to [Plaintiff] than it did to other [Town of] Colonie PDD projects, [Defendant Town's] actions constituted

-15-

intentional discrimination on the basis of disability in violation of the
Federal Fair Housing Act (42 U.S.C. § 3601 et seq.) and Title II of the
Americans With Disabilities Act (42 U.S.C. § 12131 et seq).

*See* Complaint at ¶ 1.

Additionally, Plaintiff asserts that Defendant Town has failed to "produce [a legitimate non-discriminatory] reason" for its decision and "its excuses . . . are pretextual." *See* Plaintiff's Memorandum at 18 (citing *Joseph's House and Shelter, Inc.*, . . . at *7-*8).

To the contrary, Defendant Town asserts that "Plaintiff cannot produce proof of any discriminatory policy practiced by the Town" because Defendant Town "has supported, and continues to support, affordable housing for veterans, seniors and the disabled." *See* Defendant's Memorandum at 10 (citing Town Board transcript of 1/22/15 p. 24, Mahan tr: p. 72 line 7 - p. 74 line 17, p. 84 line 21 - p. 86 line 24; p. 67 line 13 - p. 68 line 17; LaCivita tr: p. 94 line 25 - p. 95 line 17; p. 57 lines 17-25).  Moreover, Defendant Town asserts that, "[d]uring the Public Hearing on January 22, 2015, the Town Board articulated seven different reasons why the existing PDD zoning should be rescinded[.]"  *See id.* at 15.[3]  Finally, Defendant Town argues that "[t]here is nothing in

---

[3] Specifically, Defendant Town points to certain statements that members of the Town Board made during the discussion prior to the Town Board's decision to enact Local Law 2-2015, which resulted in the rescission of the site's PDD zoning classification:

> (1) The former PDD never received any zoning approvals.  (Town Board transcript 1/22/15 pp. 9, 10, 34-35)
>
> (2) The former PDD developer had informed the Town he did not intend to develop this project and had abandoned the PDD.  (Town Board transcript 1/22/15 pp. 26, 36)
>
> (3) The former PDD did not provide a public benefit to the Town. (Town Board transcript 1/22/15 pp. 13-14)

(continued...)

the evidence bearing on plaintiff's *prima facie* case which suggests the Town's stated reasons were pretextual." *See id.* at 19.

"Both the FHAA and the ADA prohibit governmental entities from implementing or enforcing housing policies in a discriminatory manner against persons with disabilities[,]" *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003), *superseded on other grounds by regulation as stated in Mhany Mgt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016), and "[b]oth statutes apply to municipal zoning decisions[,]" *id.* (citations omitted). "Under the FHA, it is unlawful '[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap.'" *Step by Step, Inc.*, 176 F. Supp. 3d at 123 (quoting 42 U.S.C. § 3604(f)(1)). The FHA also "provides that it is unlawful to 'discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap.'" *Id.* (quoting [42 U.S.C.] § 3604(f)(2)). Similarly, "the ADA provides that 'no qualified individual with

---

[3](...continued)
> (4) The former PDD had *de facto* and legally expired under the Town Code. (Town Board transcript 1/22/15 pp. 2-3, 8, 36)
>
> (5) A PDD zoning designation does not mean a project is "shovel ready." (Town Board transcript 1/22/15 pp. 9, 10, 25)
>
> (6) The neighborhood has changed since 2007, including significant increase in neighboring residential properties. (Town Board transcript 1/22/15 pp. 23-24)
>
> (7) The Town's Comprehensive Plan may be subject to different interpretations and the current Town Board did not enact the prior PDD and would not know its thinking and rationale. (Town Board transcript 1/22/15 pp. 12, 23, 24)

*See* Defendant's Memorandum at 15-16.

a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Id.* (quoting 42 U.S.C. § 12132). "Zoning is 'service' within the meaning of the ADA." *Sunrise Dev., Inc.*, 62 F. Supp. 2d at 773 (citing *Innovative Health Sys.*, 117 F.3d at 44).

Courts analyze claims of intentional discrimination under the FHA and ADA using the *McDonnell-Douglas* burden-shifting analysis. *See Step by Step, Inc.*, 176 F. Supp. 3d at 126 (citations omitted). "Under this analysis, a plaintiff first must establish a prima facie case of discrimination by presenting evidence that 'animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id.* (quoting *LeBlanc-Sternberg*, 67 F.3d at 425). "[T]he plaintiff's *prima facie* burden is 'minimal' and '*de minimus.*'" *Joseph's House & Shelter, Inc. v. City of Troy Planning Bd.*, No. 05-CV-513, 2009 WL 2413936, *2 (N.D.N.Y. Mar. 31, 2009) (citation omitted).

"If the plaintiff establishes [a] prima facie case, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the decision." *Step by Step, Inc.*, 176 F. Supp. 3d at 127 (citations omitted). "If the defendant meets that burden, the plaintiff must then prove that the defendant intentionally discriminated on the basis of a prohibited ground." *Id.* (citation omitted). However, "'[a] plaintiff need not prove that discrimination was the sole motivating factor in the challenged act; rather, a plaintiff need only show that discrimination was a motivating factor.'" *Id.* (quoting *Sunrise Dev.*, 62 F. Supp. 2d at 774 (citing *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265-66, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977))).

To determine whether a defendant took a particular action with discriminatory intent, courts

consider the following factors: "(1) the discriminatory impact of the action; (2) the historical background of the action; (3) the sequence of events leading up to the challenged action; (4) departures from normal procedural sequences; and (5) departures from normal substantive criteria." *Id.* (citing *LeBlanc*, 67 F.3d at 425; *Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999)).  The Court will address each of these factors in turn.

### 1. Discriminatory impact of Defendant Town's decision to enact Local Law 2-2015

As the Supreme Court stated in *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977), "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.  The impact of the official action whether it 'bears more heavily on [a protected group]' . . . may provide an important starting point."  *Id.* at 266 (internal quotation omitted).  "Sometimes a clear pattern, unexplainable on grounds other than [the prohibited ground], emerges from the effect of the state action even when the governing legislation appears neutral on its face . . . [b]ut such cases are rare."  *Id.* (internal citations and footnote omitted).  Absent such "a pattern . . ., impact alone is not determinative . . . ."  *Id.* (internal footnote omitted).

As evidence of the discriminatory impact of Defendant Town's enactment of Local Law 2-2015, Plaintiff asserts that "[t]he local law rescinding the PDD on the [site] force[d] [Plaintiff] to start the PDD procedure over again rather than seek an amendment of an existing PDD."  *See* Plaintiff's Memorandum at 12; *see also* Complaint at ¶ 34 (alleging that, by "enact[ing] a local law rescinding the PDD for the site, [Defendant Town made] it impossible for [Plaintiff] to develop its proposed housing for people with disabilities or go forward with its tax credit application at this

time"); Plaintiff's Statement of Facts at ¶ 50 (stating that, "[a]s a result [of the enactment of Local Law 2-2015, Plaintiff's] tax credit application was denied since it was unable to show municipal support for its proposed housing" (citing DeVita Affidavit, par. 20)).  Furthermore, Plaintiff contends that a new application entails "time and money," as "a new application for a PDD . . . require[s] an engineer [to do] engineering drawings and elevations and a new site plan not required on an amendment to an existing PDD."  *See* Plaintiff's Memorandum at 12 (citing Exhibit E [Transcript of Deposition of Town Board Member Paul Rosano], 69:6-8, 69:10-70:2).

For purposes of this motion, the Court accepts, as true, Plaintiff's allegations that, as a result of Defendant Town's enactment of Local Law 2-2015, Plaintiff would incur additional expenditures of time and money as a result of having to apply for a new PDD rather than being able to amend the existing PDD, and there is nothing in the record to suggest otherwise.  However, although Defendant Town's enactment of Local Law 2-2015 would arguably affect the mentally disabled more heavily than it would affect other groups in the community, there is nothing in the record that would support a finding that Defendant Town has engaged in a clear pattern of discrimination against individuals with a disability.  Thus, this is not one of those rare cases involving a facially neutral statute where the court can discern, as a matter of law, that "an invidious discriminatory purpose was a motivating factor" in a governmental entity's legislative action based on the impact of that action alone.  *Arlington Heights*, 429 U.S. at 266 (citations omitted).  Accordingly, the Court finds that this factor, although not dispositive, weighs slightly in favor of Defendant Town.

### 2. Historical background of Defendant Town's enactment of Local Law 2-2015

Defendant Town asserts that its enactment of Local Law 2-2015 did nothing more than

"return[] the [site] to its previous zoning classification, Commercial Office Residential (COR)."

*See* Defendant's Statement of Facts at ¶ 25; *see id.* at ¶ 72.  Plaintiff, however, asserts that, although

the previous developer, who had sought a PDD designation for the site had not moved forward with

developing the site after Defendant Town enacted Local Law 2-2007, which defined the site as a

PDD and, in fact, had notified Defendant Town in 2010 that it was abandoning its project for the

site, Defendant Town "took no action on the PDD immediately after the developer's letter [in 2010]

even though it had the discretion to eliminate the PDD and remove the property back to its original

classification[.]"  *See* Plaintiff's Statement of Facts at ¶ 16 (citing DeVita Affidavit, par. 6); *see id.*

at ¶ 17 (citing Exhibit G, February 26, 2010 Memorandum); *see id.* at ¶ 18 (citing Exhibit B,

Deposition of Joseph LaCivita, 30:2-3).  Furthermore, Plaintiff asserts that the Town Attorney's

explanation for not taking action sooner, *i.e.,* that it was "just something that has been on my desk

and needs to get done and I remembered to do it" is simply not credible.  *See* Plaintiff's Statement of

Facts at ¶ 41 (quoting Exhibit N, Transcript of Town Board meeting [12/18/14], 27:25-28:2).  In

addition, Plaintiff asserts that Defendant Town has offered no other explanation for its sudden

reversion of the site to its prior zoning designation, other than to state that it was not required to

take any such action.  Finally, Plaintiff contends that, "[a]ccording to Town Supervisor Paula

Mahon, there is a need for more affordable housing in this Town."  *See* Plaintiff's Memorandum at 6

(citing Exhibit H, Deposition of Paul Mahan, 25:3-6; Planning Board Meeting 3/12/09, p. 49, line

15-19 ("Senior Housing is one of the Supervisor's key concerns because there is not a lot of it

within the town.  She is looking for more sites that will fit it.")).

   In further support of its position that Defendant Town "does not want housing for people

with disabilities," *see* Plaintiff's Memorandum at 13, Plaintiff points to the Town Board's actions

and comments regarding the Alice Avenue project. That project was originally intended to include housing for individuals with Alzheimer's disease, although the developer later withdrew that part of the project. *See id.*; Dkt. No. 22-24 (Tr. Planning Board - Alice Avenue Project") at 2:13-14, 17-19. Plaintiff further asserts that Defendant Town "discouraged" the Alice Avenue developer from developing housing for people with Alzheimer's. *See* Dkt. No. 25-1 ("Plaintiff's Opposition Memorandum") at 6. For example, Plaintiff notes that, at the first Town Planning Board hearing regarding the project, Mr. LaCivita asked, "Is the Alzheimer's really needed here?," despite the fact that (a) the developer stated the site would be a "very secure environment for people not leaving," *see* Dkt. No. 22-25 ("Tr.-2 Planning Board - Alice Avenue Project") at 38:5-6, and "[i]t [would be] relatively easy to make certain that nobody [left] [the site]," *see id.* at 38:10-12; and (b) the developer conducted a market study and found there was a "significant shortfall in both senior apartments . . . and a shortfall in Alzheimer's units." *See* Plaintiff's Statement of Facts at ¶ 56; Tr.-2 Planning Board - Alice Avenue Project at 47:18-20. Finally, Plaintiff points out that Defendant Town did not rescind the PDD status of a project for senior housing on Alice Avenue despite the fact that the developer had not worked on the project for more than three years after Defendant Town granted its initial PDD application in 2011, yet rescinded the site's PPD status in this case. *See* P-LaCivita Tr. at 44:19-45:14; Plaintiff's Statement of Facts at ¶ 54.

Similarly, Defendant Town considered rescinding the Loudon House project but declined to do so. *See* Plaintiff's Statement of Facts at ¶¶ 57-58 (citing Exhibit I, Magguilli Deposition, 69:22-70:5). Instead, the Town Board "conditionally rescinded" the project's PDD status and gave the developers eighteen months to complete their project. *See* Dkt. No. 22-13 ("P-Maggiulli Tr.") at 69:18-70:5. In addition, Plaintiff argues that, prior to conditionally rescinding the PDD at the

Loudon House site, "the Town engaged in environmental studies . . . [and] Town Attorney [Magguilli] testified in his deposition that he did not know if any environmental studies were conducted prior to the rescission of the [Plaintiff's] PDD even though he orchestrated that rescission."  *See* Plaintiff's Statement of Facts at ¶ 59 (citing Exhibit W (Environmental Studies performed before decision to consider rescission of the Loudon House PDD); Exhibit I, Magguilli Deposition, 76:7-11).  Finally, Plaintiff asserts that the Town Attorney does not want housing for people with disabilities as evidenced by the allegedly "unpleasant expression" he made "upon learning that some of the residents would be coming from the City of Albany."  *See* Plaintiff's Memorandum at 13.

    In contrast to these allegations, Defendant Town notes that Plaintiff did not have an application pending before the Town Board when the Town Board acted to rezone the site.  *See* Defendant's Memorandum at 11 (citing Statement of Material Facts #63).  Furthermore, Defendant Town disputes Plaintiff's allegations that its zoning decisions with regard to the Alice Avenue and Loudon House projects evince discriminatory intent.  *See* Dkt. No. 28-3 ("Defendant's Reply Memorandum") at 5.  For example, Defendant Town disputes that it discouraged the developer of the Alice Avenue project from developing housing for people with Alzheimer's disease out of a discriminatory intent.  *See id.*  Instead, Defendant Town argues that the developer "eliminated an Alzheimer's Care Center from its project because it [was] to be built on a steep grade in close proximity to NYS Route 2 where 'dementia residents c[ould] wander from their residence and become disoriented, missing and lost very quickly.'"  *See id.* (quoting Hershberg letter, dated April 16, 2010 (citing Alice Avenue PDD documents attached to George affid. at Exhibit A)).  In addition, although Mr. LaCivita stated at the Planning Board meeting held to discuss the Alice

Avenue project that "'[s]enior [h]ousing [was] one . . . key concern[] because there [was] not a lot of it within the town[,]'" he explained that the site "'had a really steep gradient'" and "'was highly wooded and very treed,' thus questioning whether [the] particular location was safe for at-risk Alzheimer's patients." *See id.* (quoting Exh. B to Schonfeld Affid. p. 49 lines 7-9). Moreover, Defendant Town states that the reason it did not rescind Alice Avenue's PDD despite three years of non-development was because the original developer of the project spoke to the Town Board "several times" to make proposed changes to the project and contacted the Town's Planning and Economic Development Department. *See* Dkt. No. 21-23 (D-LaCivita Tr.") at 44:20-45:14; Dkt. No. 26-5, Defendant's Response to Plaintiff's Statement of Facts ("Defendant's Responsive Statement of Facts") at ¶ 54 (stating that "[t]he deposition testimony of Joseph LaCivita (Exh. B to Schonfeld Affid.) was misquoted. As to the Alice Avenue project, Mr. LaCivita testified "it's still in forward motion, he's still trying to keep that site going forward." (p. 44 line 25 - p. 45 line 2)).

Lastly, with regard to the Loudon House project, Defendant Town notes that "Local Law No. 5 enacted July 26, 2012 by the Town Board rescinded [the Loudon House] PDD designation but did not revoke the building permit which had an 18-month expiration date[.]" *See* Defendant's Responsive Statement of Facts at ¶ 58 (citing Exh. D to George Affid.). Moreover, Defendant Town states that "[t]he developer had . . . invested millions of dollars in developing the property, including erection of a concrete foundation, an elevator shaft, roads and other infrastructure." *See* Defendant's Reply Memorandum at 8 (citing Loudon House PDD documents, Exhibit D to George Affid.)

In assessing whether a municipality acted with discriminatory intent, "historical background" provides one evidentiary source, "particularly if it reveals a series of official actions

taken for invidious purposes." *Vill. of Arlington Heights*, 429 U.S. at 267 (citations omitted); *see also Stewart B. McKinney Found., Inc. v. Town Planning & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1211 (D. Conn. 1992) (finding that "the historical background and the sequence of events leading up to the challenged [zoning] decision" supported inference of discriminatory animus against the plaintiff wishing to rent homes to HIV-infected persons when the plaintiff was met with "organized, widespread, and effective opposition," future neighbors hired counsel, the neighborhood held a rally and a press conference against the plaintiff, and when a public information forum sponsored by the plaintiff deteriorated into a "'riotous . . . totally out of control'" situation (quotation omitted)).

In *Sunrise Dev., Inc.*, for example, the court noted that the historical background of the town board's enactment of a local law rendering nugatory Sunrise's special use permit for a "congregate care facility" ("CCF") for senior citizens and the disabled weighed in favor of a finding of discriminatory intent. *See Sunrise Dev., Inc.*, 62 F. Supp. 2d at 769. As evidence of this intent, the court noted that the town board had "expedited" the passage of the local law completely disallowing CCFs in all zoning districts except one, despite the recommendation of the town-established Citizen's Advisory Committee, which had advised "only limited regulation of senior housing[.]" *Id.* at 774-75.

As to the historical background of the enactment of Local Law 2-2015, the Court finds that, although Defendant Town points to seven statements that Town Board members made during their discussion of the Town Attorney's proposal to enact Local Law 2-2015, Defendant Town has never provided a credible explanation for why, despite the fact that the previous developer had notified Defendant Town that it would not continue the project in 2010, Defendant Town took no action to

return the site to its previous zoning classification until Plaintiff expressed an interest in amending the PDD to construct housing for the mentally disabled four years later. Thus, the Court finds that this factor weighs in favor of Plaintiff.

### 3. Sequence of events leading up to Defendant Town's enactment of Town Law 2-2015

Plaintiff argues that the "rapid sequence of events leading to the Town Board's rescission of the PDD on the site" is evidence of discrimination. *See* Plaintiff's Memorandum at 14. First, Plaintiff points out that the Town Attorney "expressed displeasure" with Plaintiff's proposed housing project at their initial meeting on November 10, 2014. *See id.* Thereafter, on December 3, 2014, Plaintiff wrote a letter to the Town Attorney advising him of its intent to apply for tax credits with the State. *See id.* (citing Exhibit L). "Within days of that letter, [the Town Attorney] informed a member of the Town's Planning and Economic Development Department that he was seeking to rescind the PDD on the site at issue." *See id.* (citing Exhibit M). At the Town Board meeting in December 2014, when asked why he wished to rescind the PDD status of the property nearly five years after learning of the prior developer's abandonment of the original project, the Town Attorney replied that "[i]t was just something that ha[d] been on [his] desk and need[ed] to get done and [he] remembered to do it," *see* Dkt. No. 22-18 ("Tr. Town Board Meeting December 18, 2014") at 27:25-28:2, in order to "clear any confusion resulting from having a long-since lapsed PDD on the Town Zoning Map," *see* Defendant's Statement of Facts at ¶ 61.

To the contrary, Defendant Town argues that the sequence of events leading up to the rescission of the site's PDD status does not evince discriminatory intent. *See* Defendant's Memorandum at 13; Defendant's Reply Memorandum at 6-7. Defendant Town notes that Town

Board members testified that they had never heard of the PDD in question until the Town Attorney placed it on the Town Board agenda, and no one appeared for the public hearing at which the matter was discussed. *See* Defendant's Memorandum at 13 (citing Statement of Material Facts #66, 69, 70). As such, although Defendant Town asserts that the site's PDD status had "*de facto* sunsetted on its own[] due to its owner's failure to move the project forward," Defendant Town argues that it acted "deliberately" and only "put the matter on for rescission . . . when it became necessary to provide clarity and accuracy on the Town Zoning Map[.]" *See id.* (citing Statement of Material Facts #61).

Furthermore, Defendant Town asserts that it is inconsequential that it did not move to rezone the property until more than three years after inactivity because "there is no requirement that the Town Board *must* act as soon as three years have elapsed." *See* Defendant's Memorandum at 11. Defendant Town explains that this flexibility is needed because "sometimes a developer does not have funding in place" or the Town Board might choose not to rescind the status in a case in which a new developer "wanted to renew the project as it stands." *See id.* at 12. Moreover, Defendant Town notes that, in this case, Plaintiff's project was "in no way a renewal of a previously-approved project." *See id.* Specifically, Defendant Town notes that Plaintiff's project proposed "strictly rental units" with "no home ownership" and "no commercial uses," while the original PDD for the site provided for a "mixed use complex," which included condominium apartment units and a general office building. *See id.*; Local Law 11-2007 at 4. Furthermore, Defendant Town asserts that it waited nearly five years to rescind the site's PDD status because interest in the site was not "triggered" until Plaintiff's engineer contacted Defendant Town about the status of the site. *See* Defendant's Reply Memorandum at 3. Finally, Defendant Town asserts that

"[l]ack of discriminatory *animus* is further demonstrated by the <u>absence</u> of public or political pressure urging the Town Board to vote one way or another." *See* Defendant's Memorandum at 13 (citations omitted).

To determine whether the sequence of events leading up to a challenged action supports an inference of discriminatory intent, courts consider whether the challenged action represented an "abrupt change from . . . prior consistent course of conduct," *Mhany Mgt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 607 (2d Cir. 2016), and whether the challenged decision was made "in the context of strong, discriminatory opposition[,]" *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) (stating that "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter" (citations omitted)).  Additionally, courts look to whether those who made the challenged zoning decision provided "credible justification" for that decision.  *Innovative Health Sys., Inc.*, 117 F.3d at 49.

As Defendant Town points out, the Town Board has discretion to return a property to its prior zoning status after more than three years of inactivity, *see* Dkt. No. 22-5 ("Town Code") at 5-6 (providing that "[t]he Town Board *may act* to return [a] property to its prior zoning district classification if it finds that: . . . (b) The PDD approval has expired by the failure of the applicant to make substantial and continuing progress in the development of the project for more than three years from the date of final approval").  In this case, however, Defendant Town chose to do so only after Plaintiff entered into discussions with Defendant Town officials about its intention to apply for an amendment to the original PDD to commence its project for housing for individuals with mental disabilities.  Such an action would arguably support a finding that this was an "abrupt change" from

Defendant Town's prior course of conduct with regard to other PDDs, *e.g.,* the Alice Avenue and Loudon House projects.

Moreover, the Town Attorney's explanation for why he did not seek rescission of the site's PDD status prior to December 2014, *i.e.*, that "[i]t was just something that ha[d] been on [his] desk and need[ed] to get done and [he] just remembered to do it," is not convincing.

Furthermore, Defendant Town does not point to anything in the record to support its assertion that a PDD *automatically* expires, *i.e.*, "*de facto* sunset[s]" on its own if a developer fails to make substantial and continuing progress in the development of a project for more than three years from the date of final approval.

Accordingly, for all of the above-stated reasons, the Court finds that this factor weighs in favor of Plaintiff.

### *4. Departures from normal procedural sequences and normal substantive criteria*

As proof that Defendant Town departed from normal procedural sequences and normal substantive criteria in rescinding the site's PDD status, Plaintiff points to the Northern Pass and Maxwell Road projects, two prior-existing PDD projects "that were not aimed at people with disabilities" that the Town Board allowed developers to amend. *See* Plaintiff's Memorandum at 16. Plaintiff asserts that, "[i]n the same year as the PDD on the . . . site was rescinded, the Town Board allowed the amendment of a PDD for a housing project known as 'Northern Pass' which permitted the developer of that project to build twelve additional apartment units over that allowed in the initial PDD." *See id.* (citing Exhibit C); Dkt. No. 22-7 ("Northern Pass Resolution") at 3. However, although Plaintiff's "proposal was going to involve a less dense use of the site than that proposed in

the initial PDD, the Town Board did not allow Plaintiff to amend the PDD." *See* Plaintiff's

Memorandum at 16. Similarly, Plaintiff argues that Defendant Town refused to allow it to amend

the PDD "to go from condominium units to rental units" but allowed an amendment to the Maxwell

Road project "which allowed for the development of 51 twin townhouse units in place of 18

condominium units and one estate lot." *See id.* (citing Exhibit D). Finally, Plaintiff argues that

Defendant Town departed from its normal procedural sequences and substantive criteria when it

enacted Local Law 2-2015 as that Local Law "was aimed at delaying housing for people with

disabilities." *See* Dkt. No. 25-1 ("Plaintiff's Opposition Memorandum") at 10 (citing Exhibit E to

Plaintiff's Motion, 69:6-70:2).

To the contrary, Defendant Town argues that it did not "delay[] or accelerate[]" any

application procedures. *See* Defendant's Memorandum at 14. Additionally, Defendant Town

asserts that it followed all "procedural and substantive requirements" and properly provided

"[n]otice of the public hearing." *See id.* (citing Town Board Hearing 1/22/15 pp. 28-29).

Furthermore, Defendant Town notes that, under New York State Town Law § 265 and Colonie

Town Code § 190-130(A), it was permitted to amend its zoning laws. *See id.*

Finally, Defendant Town disputes Plaintiff's allegations that it departed from normal

procedural sequences and substantive criteria in this case by not permitting Plaintiff to apply for a

PDD amendment even though it had permitted amendments to the Northern Pass and Maxwell

Road projects. *See* Defendant's Opposition Memorandum at 7-8. Specifically, Defendant Town

argues that it permitted the developer to amend the Northern Pass PDD because the developer's

proposal did not "increase the number of buildings" and was a "'minor modification'" to an already

approved plan. *See id.* at 7. Furthermore, Defendant Town contends that "no additional roadways

had to be developed," and the developer "demonstrated that the amendment produced a 'minor to small impact' on the physical environment and community services." *See id.* (citing Northern Pass PDD documents, Exh. B to George Affid.). In contrast, according to Defendant Town, Plaintiff did not wish to amend a PDD for an approved project but rather wished "to amend an entirely different, prior project[.]" *See id.* at 8. Finally, Defendant Town argues that, with regard to the Maxwell Road project, that project "required changes to the site because of a conservation easement" but still remained "a senior townhouse project with one less unit." *See* Defendant's Reply Memorandum at 5.

Departures from a town board's normal substantive criteria and procedural sequences in response to a zoning application can support an inference of discriminatory intent. *See Step by Step, Inc.*, 176 F. Supp. 3d at 129 (finding the town board's delay to consider a completed application while the municipality took steps to modify the zoning code as an attempt to prohibit the developer from going forward with its supportive housing project supported an inference of discriminatory intent); *Sunrise Dev., Inc.,* 62 F. Supp. 2d at 775 (noting that "sudden and dramatic" changes to existing zoning ordinances, absent an emergency and without "substantive" reasons stated on the record, amounted to deviation from normal procedural sequences).

In this case, the fact that Defendant Town permitted PDD amendments for the Northern Pass and Maxwell Road projects but did not permit Plaintiff to amend the site's existing PDD does not definitively show that Defendant Town failed to adhere to its substantive criteria or procedural sequences with regard to its decision to rescind the site's PDD. Defendant Town has come forward with several reasons why amendments were appropriate in those cases and not in this one. For example, the Northern Pass and Maxwell Road projects involved granting amendments to the same

developers who commenced the projects and who had already expended time and money on the projects.  In contrast, Plaintiff was a new developer, who sought to step into the shoes of a prior developer to begin a project that was, at least according to Defendant Town, significantly different than the project the Town Board had originally approved.  Furthermore, Defendant Town explained that it had granted amendments to the Northern Pass and Maxwell Road Projects because the proposed changes were minor, whereas, at least according to Defendant Town, Plaintiff's proposal involved major changes.

On the other hand, Plaintiff has presented evidence regarding Defendant Town's rather hasty decision to enact Local Law 2-2015, after doing nothing for several years, which arguably would support a finding of pretext.  *See Sunrise Dev., Inc.,* 62 F. Supp. 2d at 775 (quoting *Assisted Living Assoc. of Moorestown v. Moorestown Township*, 996 F. Supp. 409, 436 (D.N.J. 1998) [(stating that "[a] sudden and dramatic change to an existing zoning ordinance in response to a particular land-use application in a hasty effort to conform local zoning law to so-called fundamental Township land-use policies bespeaks pretext")]) (other citation omitted).

For all of these reasons, the Court finds that this factor weighs in neither party's favor.

In sum, the Court finds that, considered in their entirety, these factors do not weigh strongly in either party's favor.  However, given the fact that Plaintiff's burden to establish a *prima facie* case of discrimination is *de minimus*, the Court finds that Plaintiff has presented sufficient evidence to meet its burden.  Likewise, Defendant Town has come forward with evidence sufficient to meet its burden of production.  With regard to Plaintiff's ultimate burden to prove that Defendant Town intentionally discriminated against Plaintiff when it decided to enact Local Law 2-2015, thereby rescinding the site's PDD zoning status, the Court concludes that there are material issues of fact

that preclude the Court from finding in either party's favor as a matter of law.  At the summary judgment stage, it is not the court's job "'to resolve issues of fact[.]'"  *France v. Corr. Officer Elgin Morton*, No. 12-CV-5576, 2018 WL 1276860, *8 (S.D.N.Y. Mar. 9, 2018) (quoting *Brod*, 653 F.3d at 164).  Rather, the court's job is limited "'to assess[ing] whether there are factual issues to be tried.'"  *Id.* (quoting *Brod*, 653 F.3d at 164).  Accordingly, the Court denies Plaintiff's and Defendant's motions for summary judgment.


## IV. CONCLUSION

Having reviewed the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 21, is **DENIED**; and the Court further

**ORDERS** that Plaintiff's' motion for summary judgment, *see* Dkt. No. 22, is **DENIED**; and the Court further

**ORDERS** that the trial of this matter shall commence on **June 4, 2018**, at **10:00 a.m.** in **Albany, New York**.[4]


**IT IS SO ORDERED.**


Dated: March 20, 2018
     Syracuse, New York

                                     Frederick J. Scullin, Jr.
                                     Senior United States District Judge

---

[4] The Court will issue a separate Final Pretrial Order, setting forth the dates on which the parties must file and serve their pretrial papers, including any motions *in limine*, as well as the date for the Final Pretrial Conference.